1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ROBERT HANKS and STEPHANIE
HANKS,

                   Plaintiffs,

     v.

CLARK COUNTY et al.,

                   Defendants.

CASE NO. 3:22-cv-05359-DGE

ORDER ON THE PARTIES'
CROSS-MOTIONS FOR
SUMMARY JUDGMENT (DKT.
NOS. 33, 40)

# I       INTRODUCTION

This matter comes before the Court on Defendants'[1] motion for summary judgment (Dkt. No. 33) and Plaintiffs'[2] cross-motion for summary judgment (Dkt. No. 40).  For the reasons discussed below, the Court GRANTS in part and DENIES in part Defendants' motion.

---

[1] Defendants are Clark County, Deputy Lanny Kipp, Deputy Shaun Kays, Deputy Sean Boyle, Deputy Shane Clemenhagen, Deputy Donald Sullivan, and Deputy Samir Vejo.  The Court refers to the Deputy Defendants collectively unless otherwise noted.
[2] Plaintiffs are Robert Hanks and Stephanie Hanks.

1

## II    BACKGROUND

2    The following facts are undisputed by the parties.  On August 23, 2020, Plaintiffs'

3  neighbor "Carl" called 911 to report an alleged incident of domestic violence.  (Dkt. No. 26 at 4.)

4  911 calls in Clark County are handled by an agency referred to as CRESSA.  (*Id.* at 5.)  Carl told

5  the CRESSA dispatcher another woman named "Becky"[3] had informed him that Mr. Hanks was

6  hurting his wife.  However, Carl qualified this assertion by noting "I guess."  (Dkt. No. 45 at 4.)

7  Carl also expressed uncertainty about whether Becky had seen Mr. Hanks assaulting his wife.

8  He noted, "I don't know if she seen him or not."  (*Id.*)  Neither the dispatcher nor the responding

9  deputies spoke with Carl again (or with Becky) before confronting Mr. Hanks.  (*See, e.g.*, Dkt.

10  Nos. 26 at 4; 35 at 11.)  The CRESSA dispatcher, using the communication platform "CAD,"

11  created an Event Report documenting the call that noted that the call relied on "SECOND HAD

12  INFO TO RP FROM DAUGHTER IN LAW" and "RP DOESN'T KNOW ANY OTHER INFO

13  OR WHERE ANYONE IS AT."  (Dkt. Nos. 23 at 7; 26 at 5.)  The Deputy Defendants were

14  aware Carl "did not actually see or hear any disturbance."  (Dkt. No. 36 at 88.)

15    Deputy Vejo received a message on his way to the scene reporting that Mr. Hanks was

16  "FORMER COMMAND SEARGEANT MAJOR (RETIRED) NATIONAL GUARD AND

17  SQUAD LEADER AT US ARMY."  (Dkt. Nos. 23 at 7; 26 at 5.)  The Deputy Defendants all

18  arrived at Mr. Hanks's street and made a plan on how to approach Mr. Hanks's house.  (Dkt. No.

19

20
21
22
23
24

---

[3] Plaintiffs do not dispute the relevance or authenticity of the transcript of the 911 call provided by the Defendants and so the Court considers it when determining which facts are undisputed for purposes of summary judgment.  The parties do not appear to dispute that, according to the transcript provided by the Defendants, the caller provided his first name (Carl) and the first name of the woman (Becky) who told him that Mr. Hanks was assaulting his wife.  (*See* Dkt. Nos. 40 at 15; 45 at 4–5.)  The parties do appear to dispute the precise relationship of this woman to the 911 caller and the Court agrees that the transcript is unclear whether she is the girlfriend of the caller's son or his daughter-in-law.

35 at 11.)  They decided to approach Mr. Hanks's home using his driveway, positioning

themselves behind their patrol vehicle, a Chevy Tahoe, with a ballistic shield and with their

firearms unholstered.  (Dkt. Nos. 23 at 8; 26 at 6; 35 at 12.)  A police K-9 unit also responded to

the scene.  (Dkt. Nos. 23 at 8; 26 at 6.)  A neighbor, Leslie Bergshoff, noticed the officers at

Plaintiffs' home and called Mrs. Hanks.  (Dkt. No. 35 at 138.)  Mr. Hanks eventually left his

house and proceeded down the driveway to meet the approaching deputies.  (Dkt. Nos. 23 at 8;

26 at 6.)  He was wearing shorts, a t-shirt, and flip flops as he left the house.  (Dkt. Nos. 23 at 9;

26 at 6–7; 35 at 64.)  He was cooperative with the Deputy Defendants.  (Dkt. No. 35 at 13, 38,

64.)  Mr. Hanks inquired why the Deputy Defendants were there and they directed him to lie face

down on his driveway.  (Dkt. Nos. 23 at 9; 26 at 7.)  At least one deputy had their weapon

unholstered, though the parties dispute whether any of the Deputy Defendants directed their

firearms at Mr. Hanks.  (Dkt. Nos. 23 at 10; 26 at 7.)  Mr. Hanks was handcuffed while in the

prone position.  (Dkt. Nos. 23 at 10; 26 at 7–8.)

When the Deputy Defendants engaged with Mr. Hanks, he was not actively harming his

wife nor were there any signs of domestic abuse.  (Dkt. No. 35 at 11.)  Mr. Hanks did not

threaten the deputies at the time when he was handcuffed (Dkt. Nos. 23 at 10; 26 at 7; 35 at 13),

he did not have a weapon on him (Dkt. No. 35 at 13), nor did he pose a flight risk (*id.* at 38).

Mrs. Hanks also came out to the driveway and one of the deputies spoke with her after they had

handcuffed Mr. Hanks.  (Dkt. No. 35 at 142.)  The Deputy Defendants then proceeded to search

the Plaintiffs' home, even though they did not have a warrant.  (Dkt. Nos. 23 at 10; 26 at 8.)

Plaintiffs filed their suit against the Defendants on May 19, 2022.  (Dkt. No. 1.)

Plaintiffs subsequently moved the Court for leave to amend their complaint to add a state law

claim for discrimination against a veteran pursuant to the Washington Law Against

1    Discrimination ("WLAD"), Washington Revised Code § 49.60.030(1)(a).  (Dkt. No. 18.)  The

2    Court granted Plaintiffs with leave to amend (Dkt. No. 22), and Plaintiffs filed the operative

3    complaint on February 7, 2023.  (Dkt. No. 23.)  Plaintiffs allege the Defendants seized both Mr.

4    and Mrs. Hanks without reasonable suspicion, in violation of the Fourth Amendment and 42

5    U.S.C. § 1983.  (*Id.* at 17.)  Plaintiffs also allege Defendants arrested Mr. Hanks without

6    probable cause (*id.* at 18), used excessive force in arresting Mr. Hanks (*id.* at 19–20), unlawfully

7    searched Plaintiffs' home (*id.* at 21), were negligent in arresting Mr. Hanks (*id.* at 22),

8    committed assault and battery (*id.* at 24), created a nuisance by invading Plaintiffs' property (*id.*

9    at 24), and discriminated against Mr. Hanks on the basis of his status as a veteran under state law

10   (*id.* at 25).

11        On June 7, 2023, Defendants filed their motion for summary judgment, seeking to

12   dismiss Plaintiffs' claims.  (Dkt. No. 33.)  Plaintiffs filed their response and cross-motion for

13   summary judgment on June 26, 2023.  (Dkt. No. 40.)  Defendants filed a timely reply.  (Dkt. No.

14   46.)

15                          **III     DISCUSSION**

16        **A.  Legal Standard**

17        Under Federal Rule of Civil Procedure 56, a court may grant summary judgment where

18   "the movant shows that there is no genuine dispute as to any material fact and the movant is

19   entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Courts must construe the

20   evidence in favor of the non-moving party.  *Fairbank v. Wunderman Cato Johnson*, 212 F.3d

21   528, 531 (9th Cir. 2000).  The moving party bears the initial burden of proof to demonstrate the

22   absence of a genuine dispute of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986),

23   and can meet this burden by "pointing out to the district court that there is an absence of

24

1    evidence to support the nonmoving party's case," *Fairbank*, 212 F.3d at 531 (cleaned up).

2    Factual admissions made by the parties "in their pleadings are binding and cannot later be

3    revoked" by the introduction of contrary evidence at summary judgment.  *See Seaman v.*

4    *Pyramid Techs.*, Inc., No. SACV 10-00070 DOC, 2011 WL 5508971, at *3 (C.D. Cal. Nov. 7,

5    2011).  The court's role at summary judgment "is not [] to weigh the evidence and determine the

6    truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v.*

7    *Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

8    ### B.  Motion to Strike Cross-Motion for Summary Judgment

9            At the outset, the Court must address Defendants' motion to strike Plaintiffs' cross-

10   motion for summary judgment for failure to comply with the Court's scheduling order.  (Dkt.

11   No. 46 at 2.)  The Court's scheduling order set the deadline for dispositive motions as June 7,

12   2023.  (Dkt. No. 12.)  Rather than seeking leave of Court to modify the current scheduling order,

13   as envisioned by Local Civil Rule 7(k), Plaintiffs chose to file their cross-motion for summary

14   judgment 19 days after the deadline for dispositive motions.  Federal Rule of Civil Procedure

15   16(f) permits the Court to "issue any just orders" where a party fails to comply with the

16   scheduling order in a case.  The Court therefore STRIKES Plaintiffs' cross-motion for summary

17   judgment and will consider Plaintiffs' briefing only as a response to Defendants' summary

18   judgment motion.  The Court will not consider the additional briefing (Dkt. Nos. 48, 49) filed by

19   the parties after the noting deadline.

20   ### C.  Motions to Strike Post-Incident Evidence

21           Plaintiffs move to exclude "irrelevant and inadmissible post-arrest information, such as

22   the report from the Battle Ground Police . . . and the alleged discussions with Alisha Hanks."

23   (Dkt. No. 40 at 16.)  Defendants, in turn, seek to exclude the expert opinion offered by Professor

24

Gregory G. Gilbertson on similar grounds.  (*See* Dkt. Nos. 42-1 at 2; 46 at 2–3).  On summary judgment, parties "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).

The Court DENIES both motions.  "Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence."  Fed. R. Evid. 401(a).  Evidence collected by the Clark County Sheriff's Office ("CCSO") in the aftermath of Mr. Hanks's detention is relevant as it may corroborate or undermine testimony proffered by the parties and other witnesses in this action.  Moreover, "courts routinely reject objections on summary judgment where the objection merely complains that the evidence presented is not material or suffers from a curable defect."  *Hermosillo v. Cnty. of San Bernardino*, No. EDCV 15-00033-DTB, 2016 WL 10566648, at *2 (C.D. Cal. Dec. 22, 2016) (cleaned up).  Plaintiffs do not otherwise identify on what grounds they object to the CCSO report and conclusions.

Defendants similarly object to Mr. Gilbertson's testimony on relevancy grounds but appear to condition their objection on the Court overruling Plaintiffs' motion to strike.  (Dkt. No. 46 at 3.)  Because the Court denied Plaintiffs' motion, the Court DENIES Defendants' motion as moot.

**D.  Section 1983 Claims**

Plaintiffs bring claims pursuant to 42 U.S.C. § 1983 for unlawful seizure and unlawful arrest in violation of the Fourth Amendment, excessive force in violation of the Fourth and Fourteenth Amendments, and unlawful search in violation of the Fourth Amendment.  (Dkt. No.

1    23 at 17–21.)  Defendants move to dismiss each of these claims,[4] arguing the claims fail as a

2    matter of law and that they are entitled to qualified immunity.[5]  (Dkt. No. 33 at 20, 34.)

3                              a.    Unlawful Seizure and Arrest

4            Defendants argue they had reasonable suspicion to detain Mr. Hanks and that his

5    detention did not constitute an arrest necessitating probable cause.[6]  (Dkt. No. 33 at 20.)

6    Plaintiffs, in response, argue that the Deputy Defendants lacked reasonable suspicion as Carl's

7    tip did not carry sufficient indicia of reliability to provide the Deputy Defendants with reasonable

8    suspicion to seize Mr. Hanks.  (Dkt. No. 40 at 18–22.)  Plaintiffs further argue the Deputy

9    Defendants' detention of Mr. Hanks constituted an arrest and the Deputy Defendants lacked

10   probable cause to make such an arrest.  (*Id.* at 23–25.)

11                              i.    *Unlawful Seizure*

12

13

_____

14   [4] Defendants argue, and Plaintiffs fail to rebut, that Plaintiffs have not provided any evidence that
     Mrs. Hanks was seized within the meaning of the Fourth Amendment.  (Dkt. No. 33 at 24.)  The

15   Court agrees and DISMISSES Mrs. Hanks's claims of violations of her Fourth Amendment right
     to be free from unlawful seizure.

16   [5] The Court separately writes to express its frustration with the parties for relying on generalized
     pleadings and allegations in briefing regarding the Defendants' culpability for each claim alleged.

17   "Liability under section 1983 arises only upon a showing of personal participation by the
     defendant."  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Plaintiffs allege, for example,

18   that all Defendants are liable for an unlawful search of their home, but they do not plead with
     specificity which Defendants actually entered into and searched their home.  (*See, e.g.*, Dkt. No.

19   23 at 21.)  Defendants argue in briefing and present deposition testimony that Deputy Sullivan
     entered Plaintiffs' home (*see* Dkt. No. 33 at 28), but do not otherwise discuss whether the other

20   Defendants entered the house.  Plaintiffs merely assert that "**Defendants** unreasonably conducted
     a warrantless search of the Hanks' home."  (Dkt. No. 40 at 40) (emphasis added.)  Such inattentive

21   briefing make the Court's analysis more difficult than it needs to be and limits the utility of
     summary judgment.  At trial, the Court expects the parties to properly focus on each party's

22   liability.

23   [6] Neither party seriously contests that Mr. Hanks was seized within the meaning of the Fourth
     Amendment and so the Court's analysis focuses on whether the Deputy Defendants had a

24   reasonable suspicion to seize Mr. Hanks.

1    Viewed in the light most favorable to the Plaintiffs, a reasonable jury could find that the

2    Deputy Defendants did not have reasonable suspicion to seize Mr. Hanks.  "[R]easonable

3    suspicion exists when an officer is aware of specific, articulable facts which, when considered

4    with objective and reasonable inferences, form a basis for *particularized* suspicion."  *United*

5    *States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000).  Particularized suspicion, in

6    turn, must be based on an assessment of the "totality of the circumstances."  *Id.*  Officers may

7    have sufficient, particularized suspicion "where [] [they] have narrowed the time and place of

8    expected criminal activity through deduction or through a reliable tip."  *United States v. Berber-*

9    *Tinoco*, 510 F.3d 1083, 1088 (9th Cir. 2007).

10    Defendants rely primarily on the gravity of the offense alleged and the credibility of

11    Carl's tip to argue the Deputy Defendants had a reasonable suspicion that entitled them to

12    conduct a limited stop in line with *Terry v. Ohio*, 392 U.S. 1 (1968).  (Dkt. Nos. 33 at 21–23.)

13    Specifically, they assert the Deputy Defendants had  "[t]he 911 callers [sic] name, address, and

14    phone number."  (*Id.* at 23.)  They also assert the Deputy Defendants had a specific name and

15    address for Mr. Hanks as well as information indicating Mr. Hanks had committed or was

16    committing domestic violence.  (*Id.*)  The Deputy Defendants also argue they were aware Mr.

17    Hanks owned firearms, had military experience, and had small children.  (*Id.*)

18    The facts and case law, however, do not support a finding as a matter of law that the

19    deputies had reasonable suspicion at the time they detained Mr. Hanks.  Construing the facts in

20    Plaintiffs' favor, the Deputy Defendants received information from Mr. Hanks's neighbor, Carl,

21    who provided his first name, address, and phone number to the CRESSA dispatcher.  (Dkt. No.

22    45 at 6.)  Carl identified Mr. Hanks by name and expressed, with significant uncertainty, that Mr.

23    Hanks was abusing his wife.  (*Id.* at 4) (noting that Mr. Hanks was "hurting his wife pretty bad I

24

1    guess.")  Carl told the CRESSA dispatcher that his "son's girlfriend just come running into the

2    house and said that Hanks was down there beating on his wife or something."  (*Id.*)  When

3    pressed by the dispatcher about whether his son's girlfriend had seen Mr. Hanks beating his wife,

4    Carl noted "I don't know if she seen him or not."  (*Id.*)

5            "Whether reasonable suspicion exists depends upon the totality of the circumstances

6    surrounding the stop, including 'both the content of information possessed by police and its

7    degree of reliability.'"  *United States v. Williams*, 846 F.3d 303, 308 (9th Cir. 2016) (quoting

8    *Alabama v. White*, 496 U.S. 325, 330 (1990)).  In assessing the reliability of the tip and whether

9    such a tip may give rise to reasonable suspicion, Courts weigh whether the identity of the tipster

10   can be verified, *see Fla. v. J.L.*, 529 U.S. 266, 270 (2000) (noting that a tip from a known

11   informant suggests reliability because their reputation can be assessed and they can "be held

12   responsible if [] [their] allegations turn out to be fabricated."), whether the tipster had

13   "eyewitness knowledge" of an alleged offense, *Navarette v. California*, 572 U.S. 393, 399

14   (2014), whether the officers involved corroborated the information in the tip, *see id.*,  and

15   whether "the caller reported a specific and potentially ongoing crime,"  *Williams*, 846 F.3d at

16   309.

17           Weighing these factors, a reasonable jury could find that the totality of the circumstances

18   indicate the Deputy Defendants did not have reasonable suspicion to detain Mr. Hanks.  A tip

19   from an identified caller who has uncorroborated secondhand information that a specific

20   individual may be committing a crime is not per se sufficient to give an officer reasonable

21   suspicion to conduct a *Terry* stop.  *See United States v. Fernandez-Castillo*, 324 F.3d 1114, 1120

22   (9th Cir. 2003) (declining to find tip from a known source reporting erratic driving, "standing

23   alone," to be sufficient to provide reasonable suspicion for a *Terry* stop); *see also United States*

24

1  *v. Robinson*, 537 F.3d 798, 802 (7th Cir. 2008) (finding secondhand tip to provide reasonable

2  suspicion in part because officers were able to corroborate information in tip).  Carl's tip does

3  not appear to contain sufficient indicia of reliability on its own to justify an investigatory stop of

4  Mr. Hanks.  While Carl's self-identification and use of 911 are factors that weigh in favor of

5  reliability, Carl was clearly conveying secondhand information from his son's girlfriend, and

6  noted he did not know whether the girlfriend actually saw Mr. Hanks hurting his wife.  He, by

7  definition, did not have eyewitness knowledge of an alleged offense.  While "the tip was

8  certainly sufficient to justify further investigation," *Williams*, 846 F.3d at 310, it does not appear

9  sufficient as a matter of law to justify seizing Mr. Hanks absent additional corroborating

10  information, *cf. Foster v. City of Indio*, 908 F.3d 1204, 1214 (9th Cir. 2018) (noting importance

11  of corroboration in reasonable suspicion analysis).

12       The Deputy Defendants subsequent actions underscore the potential absence of

13  reasonable suspicion here.  The Deputy Defendants were aware that the 911 caller was providing

14  secondhand information.  (Dkt. No. 35 at 11, 33.)  They congregated near Plaintiffs' home before

15  engaging with Mr. Hanks but did not bother to try to attempt to contact the 911 caller to solicit

16  additional information.  (*Id.* at 12.)  Approximately 10 to 15 minutes elapsed between the time

17  the Deputy Defendants first congregated on Plaintiffs' street and the time they engaged Mr.

18  Hanks.  (*Id.* at 34.)  The Deputy Defendants had no other evidence corroborating the information

19  provided by Carl and took no other steps to corroborate the information before engaging Mr.

20  Hanks.  (*Id.* at 36.)  And nothing about Mr. Hanks's behavior or the surrounding environment

21  prior to his seizure suggested that a crime had been or was being committed.  (*Id.* at 13.)

22       Courts also weigh "the gravity of the offense in balancing the interest of crime prevention

23  and investigation against the interest in privacy and personal security when a court assesses the

24

reasonableness of a *Terry* stop." *United States v. Grigg*, 498 F.3d 1070, 1077 (9th Cir. 2007).

For misdemeanors, courts must also pay "particular attention to the potential for ongoing or

repeated danger . . . and any risk of escalation (e.g., disorderly conduct, assault, domestic

violence)." *Id.* at 1081.  Risk to officers' safety and the threat posed by a potential subject are

proper considerations when officers consider how to investigate a potential crime.  However, the

circumstances here do not establish as a matter of law that the Deputy Defendants had a

particularized suspicion that Mr. Hanks had committed domestic assault.

Defendants additionally argue Mr. Hanks's status as a veteran and a firearms owner

supported their reasonable suspicion that a crime had been committed and the method in which

they conducted their investigatory stop.  (Dkt. No. 33 at 23.)  But such an approach prioritizes

officer safety above the rights and interests of citizens.  As the Ninth Circuit has observed:

> it is the nature of a democratic society that all of us, especially the police, take some
> risks in the interest of preserving freedom. While we must not compel police
> officers to take unnecessary risks, total security is possible, if at all, only in a society
> that puts a much lesser premium on freedom than does ours.

*Washington v. Lambert*, 98 F.3d 1181, 1187 (9th Cir. 1996).

The Court therefore DENIES Defendants' motion as to Mr. Hanks's claim for unlawful

seizure as a reasonable jury could find the Deputy Defendants lacked reasonable suspicion to

detain Mr. Hanks.

### ii.   Unlawful Arrest

The Court separately finds a reasonable jury could conclude the Deputy Defendants

arrested Mr. Hanks without probable cause.  Defendants' sole argument regarding Plaintiffs'

unlawful arrest claim is that Mr. Hanks's detention did not constitute an arrest.  They do not

contest that the Deputy Defendants did not have probable cause to arrest Mr. Hanks.  (*See* Dkt.

1    No. 46 at 5) (noting that "none of the defendants have ever asserted there was probable cause

2    because they **<u>did not</u>** arrest the defendant.") (emphasis in original).

3         "In determining whether stops have turned into arrests, courts consider the totality of the

4    circumstances." *Lambert*, 98 F.3d at 1185 (cleaned up); *see also Green v. City & Cnty. of San*

5    *Francisco*, 751 F.3d 1039, 1047 (9th Cir. 2014).  The Ninth Circuit in *Lambert* detailed several

6    factors courts should consider in determining whether an investigatory stop may more properly

7    be characterized as an arrest.  First, courts should consider the intrusiveness of the techniques

8    used by officers in effectuating an investigatory stop.  98 F.3d at 1188.  Intrusive techniques

9    include handcuffing, pointing guns at the suspect, and "physically restrict[ing] the suspect's

10   liberty."  *Id.* at 1189.  Where officers have used intrusive techniques to effectuate an

11   investigatory stop, such techniques are justified only in exceptional circumstances

12            such as 1) where the suspect is uncooperative or takes action at the scene that raises
             a reasonable possibility of danger or flight; 2) where the police have information
13            that the suspect is currently armed; 3) where the stop closely follows a violent
             crime; and 4) where the police have information that a crime that may involve
14            violence is about to occur.

15   *Id.* (cleaned up).  Additionally, courts may consider "the specificity of the information that the

16   persons actually being sought are likely to forcibly resist police interrogation" and "the number

17   of police officers present."  *Id.* at 1190.

18        The Deputy Defendants clearly used intrusive means to effectuate a stop—they ordered

19   Mr. Hanks to lie face down on the ground, handcuffed him, and restricted his freedom of

20   movement.[7]  (*See* Dkt. No. 26 at 7–8.)  Almost none of the special circumstances discussed

21

22   _____

     [7] The parties dispute whether any deputies pointed their weapons directly at Mr. Hanks, (*see* Dkt.
23   Nos. 33 at 13, 40 at 11) but this fact is not material to the Court's unlawful arrest analysis as the
     Deputy Defendants employed clearly intrusive means in detaining Mr. Hanks notwithstanding
24   this dispute.

ORDER ON THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 33, 40) - 12

1   above were present to merit the use of such intrusive means.  Mr. Hanks was cooperative and did

2   not take any action at the scene that posed a risk of flight or danger to the deputies.  The Deputy

3   Defendants did not have any information that Mr. Hanks was currently armed when they arrested

4   him.  (*See, e.g.*, Dkt. Nos. 35 at 13, 61.)  The Deputy Defendants also did not have information

5   that a crime of violence was about to occur—they were responding to reports of potentially

6   ongoing domestic violence but witnessed no such violence upon encountering Mr. Hanks.  There

7   was no information suggesting Mr. Hanks would forcibly resist interrogation—he was a

8   colleague of and had worked with several of the deputies (*see, e.g.,* Dkt. No. 35 at 59)—and the

9   officers outnumbered Mr. Hanks.  The Deputy Defendants' delay in approaching the home also

10  weighs against a finding that the intrusive techniques used to detain Mr. Hanks were

11  reasonable—nearly 30 minutes elapsed between the 911 call and the time at which the Deputy

12  Defendants engaged Mr. Hanks.  (*Id.* at 37.)

13      While the officers were responding to a report of domestic violence, a reasonable jury

14  could find that this alone is not sufficient to merit the intrusive techniques used to detain Mr.

15  Hanks.[8]  *See Green*, 751 F.3d at 1048 (holding that reasonableness of officers' use of intrusive

16  methods to detain suspect was "a conclusion over which reasonable jurors could disagree.")

17      In sum, the Court finds that a reasonable jury could find the Deputy Defendants both

18  seized Mr. Hanks without reasonable suspicion and that this seizure constituted an unlawful

19  arrest.  The Court therefore DENIES Defendants' motion for summary judgment on these claims

20

21

22  _____

    [8] The Court in no way wishes to diminish the seriousness of domestic violence and encourages

23  police departments to take heed of the Washington Legislature's intent to "stress the enforcement
    of the laws to protect the victim and . . . communicate the attitude that violent behavior is not

24  excused or tolerated."  Wash. Rev. Code § 10.99.010.

1   as to Mr. Hanks but GRANTS Defendants' motion for summary judgment on these claims as to

2   Mrs. Hanks for the reasons discussed above.

3                                **b.  Excessive Force**

4           Plaintiffs also bring claims of excessive force in violation of the Fourth and Fourteenth

5   Amendment.

6           The Court first determines which standard is applicable to Plaintiffs' excessive force

7   claim.  "Where, as here, the excessive force claim arises in the context of an arrest or

8   investigatory stop of a free citizen, it is most properly characterized as one invoking the

9   protections of the Fourth Amendment."  *See Graham v. Connor*, 490 U.S. 386, 394 (1989); *see*

10  *also Piazza v. Jefferson Cnty., Alabama*, 923 F.3d 947, 952 (11th Cir. 2019) (noting that "the

11  Fourth Amendment prevents the use of excessive force during arrests" while the Fourteenth

12  Amendment protects pre-trial detainees); *Young v. Wolfe*, 478 F. App'x 354, 356 (9th Cir. 2012)

13  (noting that Fourth Amendment's protections apply to arrestees not pre-trial detainees).  Since

14  Plaintiffs do not assert Mr. Hanks was a pre-trial detainee, the Court GRANTS Defendants'

15  summary judgment motion as to Plaintiffs' Fourteenth Amendment claim for excessive force.

16          Defendants argue the Deputy Defendants did not use excessive force on Mr. Hanks by

17  detaining him for a short period of time.  (Dkt. No. 33 at 25.)  They rely primarily on their

18  argument that the deputies had reasonable suspicion to detain Mr. Hanks and had reasonable

19  concerns for their own safety.  (*Id.* at 27.)  Plaintiffs, in response, argue the Deputy Defendants

20  used excessive force when drawing their guns and aiming them at Mr. Hanks (Dkt. No. 40 at 31),

21  that such force is per se deadly force (*id.* at 32), and further argue the use of excessive force is

22  fact-specific and not suited for resolution at summary judgment (*id.* at 33).

23

24

1      To determine whether officers used excessive force in effectuating an arrest, the Court

2  must balance "the nature and quality of the intrusion on the individual's Fourth Amendment

3  interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396

4  (cleaned up). Such an inquiry is fact specific. *Id.* In assessing the nature of the government

5  interest, courts should assess "the severity of the crime at issue, whether the suspect poses an

6  immediate threat to the safety of the officers or others, and whether he is actively resisting arrest

7  or attempting to evade arrest by flight." *Id.* "Where these interests do not support a need for

8  force, 'any force used is constitutionally unreasonable.'" *Green*, 751 F.3d at 1049 (quoting *Lolli*

9  *v. County of Orange*, 351 F.3d 410, 417 (9th Cir. 2003)).

10     Here, a genuine dispute of material fact precludes the Court from awarding summary

11  judgment to Defendants. As discussed, the parties dispute whether or not any of the Deputy

12  Defendants pointed their guns at Mr. Hanks, a determination which is necessary to categorize the

13  nature of the force used against Mr. Hanks. *See Hopkins v. Bonvicino*, 573 F.3d 752, 776 (9th

14  Cir. 2009) (noting that it is clearly established that pointing a weapon at an unarmed suspect may

15  constitute excessive force in violation of the Fourth Amendment where the suspect does not pose

16  a danger to the officers involved). Specifically, the Deputy Defendants deny pointing a firearm

17  at Mr. Hanks (*see* Dkt. No. 35 at 117) and Mrs. Hanks testified that she recalls one deputy had a

18  firearm drawn and pointed at Mr. Hanks (*see id.* at 140–41).[9] Accordingly, the Court DENIES

19  Defendants' motion for summary judgment as to Mr. Hanks's Fourth Amendment excessive

20

21

22  [9] Defendants argue Mr. Hanks did not see a firearm pointed at him (Dkt. No. 46 at 6), but that does
    not resolve the conflict between Mrs. Hanks' testimony and that of the deputies. And in his citizen

23  complaint to the CCSO, Mr. Hanks wrote, under criminal penalty, that he "saw a Deputy with the
    40mm gun deployed and realized the Deputies were prepared to use deadly force against me or

24  my family." (Dkt. No. 36 at 108.)

1  force claim and GRANTS Defendants' motion for summary judgment as to Mr. Hanks's

2  Fourteenth Amendment excessive force claim.

3          ### c.  Unlawful Search

4          Plaintiffs also allege Defendants violated their Fourth Amendment right to be free in their

5  homes from "unreasonable searches and seizures."  U.S. CONST. amend. IV.

6          Defendants argue "Plaintiffs suffered no constitutional injury from the warrantless entry

7  of the deputies into their house."  (Dkt. No. 33 at 28.)  They further argue that the Deputy

8  Defendants' warrantless search of Plaintiffs home was justified as incidental to their arrest of Mr.

9  Hanks[10] and that Defendant Sullivan had permission to enter Plaintiffs' home.  (*Id.*)  Plaintiffs, in

10 response, argue there is a genuine dispute of material fact regarding whether Defendant Sullivan

11 had consent to enter Plaintiffs' home and Defendants' reliance on the incidental search exception

12 is misplaced.  (Dkt. No. 40 at 39–40.)

13         "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a

14 home without a warrant are presumptively unreasonable."  *Payton v. New York*, 445 U.S. 573,

15 586 (1980) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 477 (1971)).  Notwithstanding

16 this presumption, courts permit officers to conduct a warrantless search incident to arrest to

17 "look in closets and other spaces immediately adjoining the place of arrest from which an attack

18 could be immediately launched."  *Maryland v. Buie*, 494 U.S. 325, 333 (1990).  Additionally,

19 officers may conduct a "protective sweep" where they have "articulable facts which, taken

20 together with the rational inferences from those facts, would warrant a reasonably prudent officer

21 in believing that the area to be swept harbors an individual posing a danger to those on the arrest

22 scene."  *Id.* at 334.

23

24 [10] Defendants' argument on this point appears to implicitly concede that they arrested Mr. Hanks.

Mr. Hanks was detained approximately 75 to 100 feet from his house (*see* Dkt. No. 41-6 at 3), and so the warrantless search of his home cannot be categorized as "immediately adjoining" the place of his arrest.  Nor can it be justified as a "protective sweep."  Defendants do not point to any articulable facts that would lead a reasonably prudent officer to believe that someone or something in Mr. Hanks's home posed a threat to the Deputy Defendants' safety. *See United States v. Paopao*, 469 F.3d 760, 765 (9th Cir. 2006).  There was no "reasonable suspicion of danger."  *Id.* at 766.  Mr. Hanks was detained and cooperative and officers had no reason to suspect that anyone else in the house posed a threat to them.

The Court separately finds there is a genuine issue of material fact that precludes summary judgment as to whether the deputies had consent to enter Plaintiffs' home.  Authorities may conduct a warrantless search of a home where there is voluntary consent to the search.  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 223 (1973); *Vale v. Louisiana*, 399 U.S. 30, 35 (1970). Here, the parties dispute whether Mrs. Hanks gave Deputy Sullivan consent to enter Plaintiffs' home.  Deputy Sullivan asserts he had consent to enter the home.  (Dkt. No. 35 at 65.)  Mrs. Hanks, by contrast, asserts she did not give permission for any deputy to enter her home.  (Dkt. No. 44 at 1.)[11]  As such, there is a genuine dispute of material fact that precludes the Court from granting summary judgment to the Defendants on Plaintiffs' unlawful search claim.

---

[11] Defendants argue that Mrs. Hanks's affidavit contradicts her prior deposition testimony and should not be permitted to create a genuine dispute of material fact.  (*See* Dkt. No. 46 at 3–4.) "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."  *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (cleaned up).  "[T]o trigger the sham affidavit rule, the district court must make a factual determination that the contradiction is a sham."  *Id.*  The Court declines to find Mrs. Hanks's affidavit is a sham.  Mrs. Hanks previously testified that she did not remember Deputy Sullivan asking for permission to enter her house.  (Dkt. No. 35 at 144.)  She further stated "[n]o one was invited to the inside of the house."  (*Id.* at 145.)  While Mrs. Hanks expressed some uncertainty about her recollection, she clearly stated that no officers were invited into the house in her prior deposition and this statement supports her subsequent affidavit.

Therefore, the Court DENIES Defendants' motion for summary judgment as to Plaintiffs' unlawful search claim.

### d. *Monell* Claim

Defendants argue they are entitled to summary judgment on any *Monell* claim brought against Clark County.  (Dkt. No. 33 at 39.)  Plaintiffs do not respond to this argument, and indeed appear to concede as much by seeking to hold the county liable under a respondeat superior theory of liability.  (*See* Dkt. No. 40 at 47).  The Court therefore GRANTS Defendants' motion for summary judgment against Clark County as to all of Plaintiffs' § 1983 claims.

### e. Qualified Immunity[12]

Defendants also argue they are entitled to qualified immunity.  (Dkt. No. 33 at 34.) "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). To determine whether an officer is entitled to qualified immunity, the Court must assess whether:

> (1) the facts alleged, taken in the light most favorable to the party asserting injury, show that the officer's conduct violated a constitutional right, and (2) the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood her conduct to be unlawful in that situation.

*Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).  Courts have discretion to assess either prong of the qualified immunity test first.  *See Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 818, 172 L. Ed. 2d 565 (2009).

Here, because the Court has already determined there are genuine issues of material fact precluding a grant of summary judgment as to whether the Deputy Defendants committed a

---

[12] The Court focuses its qualified immunity analysis on Plaintiffs' unlawful seizure and arrest claims and excessive force claims as Defendants do not discuss why they are entitled to qualified immunity as to Plaintiffs' unlawful search claims.  The Court makes no determination as to whether Defendants are entitled to qualified immunity on the unlawful search claim.

constitutional violation, the Court skips to the second step of the qualified immunity analysis—whether the rights at issue were clearly established such that a reasonable officer would have understood their conduct to be unlawful.  This is a two-step analysis.  The Court must determine "(1) whether the law governing the conduct at issue was clearly established and (2) whether the facts as alleged could support a reasonable belief that the conduct in question conformed to the established law."  *Green*, 751 F.3d at 1052.

The specific conduct at issue in a case need not have been previously held to be unconstitutional to find that a right is "clearly established."  *Tarabochia v. Adkins*, 766 F.3d 1115, 1125 (9th Cir. 2014).  "[O]fficials can still have fair warning that their conduct violates established law even in novel factual circumstances."  *Torres*, 648 F.3d at 1129.  This is especially important in the Fourth Amendment context where, as the Ninth Circuit has advised, "the constitutional standard of 'reasonableness' demands a fact-specific inquiry."  *Id.* Accordingly, the Court finds it was well established at the time of Mr. Hanks's detention that "individuals may not be subjected to seizure or arrest without reasonable suspicion or probable cause, especially when the stop includes detention and interrogation at gunpoint, and that highly intrusive measures may not be used absent extraordinary circumstances."  *Green*, 751 F.3d at 1052.

It was also well established that "the State generally should not be allowed to detain and question an individual based on a reliable informant's tip which is merely a bare conclusion unsupported by a sufficient factual basis."  *State v. Sieler*, 621 P.2d 1272, 1275 (Wash. 1980); *cf. United States v. Brown*, 636 F. App'x 514, 518 (11th Cir. 2016) ("When an officer's purported reasonable suspicion is based solely on a third party's tip, as was the case here, we determine whether the tip itself bore sufficient indicia of reliability to support reasonable suspicion.");

1   *United States v. Woosley*, 361 F.3d 924, 926–27 (6th Cir. 2004) (noting that "a tip from **an**

2   **informant that has been proven to be reliable** may support a finding of probable cause in the

3   absence of any corroboration.") (emphasis added).[13]

4           The Court next turns to whether an officer, armed with the same facts known to the

5   Deputy Defendants, could reasonably believe that their actions were lawful.  *See Green*, 751

6   F.3d 1039, 1052 (9th Cir. 2014).  Viewing the facts in the light most favorable to Plaintiffs, the

7   Deputy Defendants received word from a known citizen informant who had not previously

8   reported any crimes to the police and who expressed substantial uncertainty about the

9   information he was relaying.  The information was also secondhand and Carl specifically noted

10  he was unsure whether his son's girlfriend had actually seen Mr. Hanks assault his wife.  The

11  Deputy Defendants undertook no further steps to corroborate whether Mr. Hanks had actually

12  committed domestic violence before intrusively seizing him.  Keeping in mind that "our task at

13  this stage in the litigation is not to attempt to weigh the facts and resolve the issues definitively in

14  favor of one party or another," the Court finds that the Deputy Defendants "should stand trial for

15  the constitutional violations of which they are accused" and that a jury should determine whether

16  they are entitled to qualified immunity as to Mr. Hank's seizure and arrest.  *See Johnson v. Bay*

17  *Area Rapid Transit Dist.*, 724 F.3d 1159, 1180 (9th Cir. 2013); *see also Green*, 751 F.3d at 1053.

18          The Court separately notes that a genuine dispute of material fact precludes the Court

19  from granting qualified immunity as to Plaintiffs' excessive force claims.  It is clearly

20  established that pointing a weapon at an unarmed, non-resisting suspect may violate the Fourth

21

22  ---

    [13] "In the absence of binding precedent, a court should look to whatever decisional law is available
23  to ascertain whether the law is clearly established for qualified immunity purposes, including
    decisions of state courts, other circuits, and district courts." *Drummond ex rel. Drummond v. City*
24  *of Anaheim*, 343 F.3d 1052, 1060 (9th Cir. 2003) (cleaned up).

ORDER ON THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 33, 40) - 20

1  Amendment.  *See Hopkins*, 573 F.3d at 776.  And, as discussed above, there is a genuine dispute

2  of material fact as to whether any of the Deputy Defendants pointed their weapons at Mr. Hanks

3  when they detained him.  As such, the Court DENIES Defendants' motion for summary

4  judgement as to Plaintiffs' federal claims on the basis of qualified immunity.

5         **E.  State Law Claims**

6         Defendants also move to dismiss Plaintiffs' various state law claims.

7           **a.  State Law Immunity**

8         Defendants argue they have both statutory and common law immunity from suit

9  regarding Plaintiffs' state law claims.  (Dkt. No. 33 at 37.)  Specifically, Defendants argue they

10  are entitled to immunity under Washington Revised Code § 10.99.070.  (*Id.*)

11         Washington Revised Code § 10.99.070 provides:

12      [a] peace officer shall not be held liable in any civil action for an arrest based on
    probable cause, enforcement in good faith of a court order, or any other action or

13      omission in good faith under this chapter arising from an alleged incident of
    domestic violence brought by any party to the incident.

14  *Id.*  "Courts interpreting the 'good faith' requirement under Washington Revised Code 10.99.070

15  have held that it is essentially the same as the qualified immunity analysis under federal law."

16  *Parrott v. City of Bellingham*, No. CV C17-0044RSL, 2017 WL 3267696, at *2 (W.D. Wash. Aug.

17  1, 2017).

18         Defendants also argue they are entitled to common law qualified immunity under

19  Washington law.  "Police officers have common law qualified immunity from state tort claims if

20  their conduct meets a three-part test: (1) they are carrying out a statutory duty, (2) according to

21  the procedures dictated by statute and superiors, and (3) they acted reasonably."  *Est. of Lee ex*

22  *rel. Lee v. City of Spokane*, 2 P.3d 979, 990 (Wash. Ct. App. 2000).  The common law qualified

23

24

immunity reasonableness requirement also appears to be the same analysis as for federal

qualified immunity. *See Dang v. Ehredt*, 977 P.2d 29, 35 (Wash. Ct. App. 1999).

Because the Court has found that whether the Deputy Defendants are entitled to qualified

immunity as to Plaintiffs' federal claims is a question for the trier of fact, the Court cannot grant

summary judgment as to either Defendants' statutory or common law defense. The Court

therefore DENIES Defendants' motion for summary judgment on the basis that the officers are

immune from Plaintiffs' state law claims.[14]

### b.  Negligence

Defendants argue Washington law does not recognize a tort of negligent investigation

(Dkt. No. 33 at 30) and that Washington Revised Code § 10.99.070 provides the Deputy

Defendants with a good faith statutory defense to any tort claims arising from "an alleged

incident of domestic violence." Plaintiffs, in response, argue Defendants misconstrue their claim

and argue Washington law does permit tort liability for the negligent performance of law

enforcement duties. (Dkt. No. 40 at 41.) Defendants reply that "Plaintiffs have only made

allegations against the defendants that are prohibited under the public duty doctrine," which

forecloses their negligence claim (*see* Dkt. No. 46 at 9).

The Court agrees with Plaintiffs, and Defendants concede, that Washington does appear

to recognize tort claims for negligent actions undertaken by police officers in the course of their

investigations. *See Beltran-Serrano v. City of Tacoma*, 442 P.3d 608, 613 (Wash. 2019)

(recognizing tort for negligently performing law enforcement activities). Additionally, the

---

[14] The Court also notes that the state common law qualified immunity defense is not available for claims of assault or battery that relate to excessive force. *See Staats v. Brown*, 991 P.2d 615, 627–28 (Wash. 2000), *as amended* (Jan. 24, 2000) (holding that state qualified immunity is not "available for claims of assault and battery arising out of the use of excessive force to effectuate an arrest.")

Washington Supreme Court in *Beltran-Serrano* held that the public duty doctrine did not foreclose a recognition that officers owed a common law duty to "to refrain from causing foreseeable harm in the course of law enforcement interactions with individuals." *Beltran-Serrano*, 442 P.3d at 615.  The Court also believes that Plaintiffs' complaint adequately pled that the Defendants owed a duty of reasonable care, as envisioned by *Beltran-Serrano*, to Plaintiffs "to take reasonable care so not to cause foreseeable harm, such as wrongful detention and arrest, in the course of such law enforcement interactions." (Dkt. No. 23 at 22.)  Construing the facts in favor of the Plaintiffs, a reasonable jury could find that the Deputy Defendants were negligent in the course of their interactions with Mr. Hanks.  The Court therefore DENIES Defendants' motion for summary judgment as to Plaintiffs' negligence claim.

### c.  **Assault and Battery**[15]

Defendants argue Plaintiffs' assault and battery claim hinges upon Plaintiffs' excessive force claim.

A party is liable for assault where "he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and . . . the other is thereby put in such imminent apprehension." *Brower v. Ackerley*, 943 P.2d 1141, 1145 (Wash. Ct. App. 1997) (cleaned up).  A party is liable for battery where

---

[15] The Court notes that assault and battery are separate tort claims in Washington, a fact unaddressed by the parties. *See Sutton v. Tacoma Sch. Dist. No. 10*, 324 P.3d 763, 767 (Wash. Ct. App. 2014).  The parties appear to conflate the two torts in their briefing.  Notwithstanding this omission, the Court agrees that whether the Deputy Defendants' committed either assault or battery is ultimately dependent on a finding of whether the Deputy Defendants had a "privilege" to make harmful or offensive contact with Mr. Hanks.  *See Garratt v. Dailey*, 279 P.2d 1091, 1093 (Wash. 1955).  Both analyses thus turn on whether the Deputy Defendants' used excessive force in arresting Mr. Hanks and, if so, were entitled to qualified immunity.

1    they intentionally cause "harmful or offensive bodily contact with the plaintiff." *Sutton v.*

2    *Tacoma Sch. Dist. No. 10*, 324 P.3d 763, 766 (Wash. Ct. App. 2014).

3            As Defendants note:

4            [t]he defendants properly detained Mr. Hanks for a brief period of time to
             investigate a credible claim of assault by Mr. Hanks against his wife. They had a
5            reasonable suspicion that a crime occurred and acted pursuant to their training,
             policies, and procedures. Therefore, there can be no assault and battery, unless this
6            court finds that Defendants used excessive force to arrest him.

7    (Dkt. No. 33 at 29.)

8            Because the Court determined that Plaintiffs' excessive force claim is a matter for the

9    jury to decide, the Court DENIES Defendants' motion for summary judgment as to Plaintiffs'

10   assault and battery claim.

11                               **d. Nuisance**

12           Defendants also move for summary judgment on Plaintiffs' nuisance claim. (Dkt. No. 33

13   at 30.) According to Defendants, Plaintiffs' nuisance claim is duplicative of their negligence

14   claim (*id.*) and the Deputy Defendants "did not unreasonably interfere with the Hanks's

15   enjoyment of their property." (Dkt. No. 46 at 10.)[16]

16           Washington defines a nuisance as

17           unlawfully doing an act, or omitting to perform a duty, which act or omission either
             annoys, injures or endangers the comfort, repose, health or safety of others, offends
18           decency, or unlawfully interferes with, obstructs or tends to obstruct, or render
             dangerous for passage, any lake or navigable river, bay, stream, canal or basin, or
19           any public park, square, street or highway; or in any way renders other persons
             insecure in life, or in the use of property.
20

21

22

23   ───────────────────
     [16] The parties appear to agree that Plaintiffs are bringing a private, rather than public, nuisance
24   claim.

1    Wash. Rev. Code § 7.48.120.  "An actionable nuisance must either injure the property or

2    unreasonably interfere with enjoyment of the property." *Tiegs v. Watts*, 954 P.2d 877, 883–84

3    (Wash. 1998).

4          Whether the Deputy Defendants unreasonably interfered with Plaintiffs' use and

5    enjoyment of their property is likely to be closely tied to whether the Deputy Defendants'

6    decision to detain Mr. Hanks was reasonable.  As the Washington Supreme Court has advised,

7    "[n]o fixed rule can be given that will be applicable to all cases.  Each [nuisance] case must

8    therefore depend largely upon its own facts." *Crawford v. Cent. Steam Laundry*, 139 P. 56, 57

9    (Wash. 1914).  The facts may also show the injury alleged here is duplicative of Plaintiffs'

10   negligence claim.  As such, the Court declines to decide as matter of law whether Defendants are

11   entitled to summary judgment as to Plaintiffs' nuisance claim and leaves the issue to trial.[17]

12                    **e.  Veteran Discrimination**

13          Finally, Defendants move for summary judgment on Plaintiffs' claim that Mr. Hanks was

14   discriminated against based on his status as a veteran under the WLAD.

15          Plaintiffs argue that Mr. Hanks was discriminated against under the WLAD "when he

16   was prevented from accessing the public roadway in front of his home."  (Dkt. No. 40 at 44.)

17   Plaintiffs therefore appear to argue Mr. Hanks was denied access to a public accommodation on

18   the basis of his veteran status pursuant to Washington Revised Code § 49.60.030(1)(b).

19          To prevail on their WLAD claim, Plaintiffs must establish Mr. Hanks

20          is a member of a protected class, . . . that the defendant is a place of public

21          accommodation, . . . that the defendant discriminated against the plaintiff, whether

22   _____

     [17] If at trial it is determined that the nuisance claim is grounded in the same facts and allegations
23   as Plaintiffs' negligence claim, only the negligence claim will be given to the jury for deliberation.
     *See Hurley v. Port Blakely Tree Farms L.P.*, 332 P.3d 469, 478 (Wash. Ct. App. 2014) ("Rather,
     the nuisance claim was grounded in the same facts and allegations as the negligence claim.  The
24   trial court did not err in dismissing the nuisance claim as duplicative.").

1   directly or indirectly, . . . and [] that the discrimination occurred 'because of' the
2   plaintiff's status or, in other words, that the protected status was a substantial factor
    causing the discrimination[.]

3   *State v. Arlene's Flowers*, Inc., 441 P.3d 1203, 1220 (Wash. 2019); *see also Fell v. Spokane*

4   *Transit Auth.*, 911 P.2d 1319, 1328 (Wash. 1996).

5         Plaintiffs have failed to meet this burden.  While Plaintiffs asserts Mr. Hanks intended to

6   access his street (Dkt. No. 43 at 1) and Defendants admit they seized Mr. Hanks while

7   responding to a domestic violence call "because he had served, and was a veteran of, in the

8   United States Military" (Dkt. Nos. 23 at 17; 26 at 11), Plaintiffs have not proven the Defendants

9   are "a place of public accommodation."  Plaintiffs' amended complaint contains no allegations

10  that the roadway Mr. Hanks was denied access to was a public accommodation, nor do Plaintiffs

11  proffer evidence that the roadway was in the control of or owned by any of the Defendants,

12  which appears to be a requirement under Washington law.  *See* 911 P.2d at 1319 (noting that a

13  plaintiff must prove "the defendant's business or establishment is a place of public

14  accommodation.").

15        Moreover, while Defendants admit the manner and method of detaining Mr. Hanks, who

16  was the subject of a domestic violence call, was due to Mr. Hanks's veteran status and their

17  belief that Mr. Hanks posed a greater danger than a non-veteran suspect might pose, there is no

18  evidence Defendants sought to prevent Mr. Hanks from accessing the roadway on account of his

19  veteran status.  Rather, Mr. Hanks was prevented from accessing the roadway as a consequence

20  of the Defendants' decision to detain Hanks for being suspected of having committed domestic

21  violence.

22

23

24

The Court therefore finds that Plaintiffs have failed to present evidence sufficient to establish a prima facie case of veteran discrimination and GRANTS Defendants' motion for summary judgment as to this claim.

### f.  County Liability

Defendants concede that the Deputy Defendants were acting within the scope of their employment and therefore "if any of them are found liable, the county is responsible to pay the damages pursuant to RCW 4.96.010."  (Dkt. No. 46 at 11.)  The Court therefore DENIES Defendants' motion for summary judgment on this point as moot.

### IV     CONCLUSION

Accordingly, and having considered Defendants' motion (Dkt. No. 33), the briefing of the parties, and the remainder of the record, the Court finds and ORDERS that Defendants' motion is GRANTED in part and DENIED in part as follows:

1.  Mrs. Hanks's claim for unlawful seizure is DISMISSED.

2.  Mr. Hanks's Fourteenth Amendment excessive force claim is DISMISSED.

3.  Plaintiffs' *Monell* claim is DISMISSED.

4.  Mr. Hanks's claim for veteran discrimination is DISMISSED.

5.  The Court DECLINES to rule on Defendants' motion for summary judgment on Plaintiffs' nuisance claim and leaves the issue for trial.

6.  Defendants' request to dismiss all other claims is DENIED.

The Court also STRIKES Plaintiffs' cross-motion for summary judgment (Dkt. No. 40) for failure to comply with the Court's scheduling order.

Dated this 19th day of July, 2023.

1

2

David G. Estudillo
United States District Judge

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24